UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

ADNET, INC.,

        Plaintiff,

v.

ROHIT SONI, *et al.*,

        Defendant.

Civil No. 1-21-cv-00130-MSN

## MEMORANDUM OPINION

This matter comes before the Court on the parties' cross-motions for summary judgment (Dkt. Nos. 25, 38). For the reasons stated below, Adnet, Inc.'s ("Adnet" or "plaintiff") motion (Dkt. No. 25) will be denied and Rohit Soni, Laura Barr, and Jason Laird's ("Soni," "Barr," and "Laird," collectively "defendants") motion (Dkt. No. 38) will be granted.

### I. BACKGROUND

#### A. Work Under the USAMMDA Contract

The following facts are taken from the parties' Local Rule 56(B) statements and are undisputed unless otherwise indicated. (*See* Pl.'s Stmt. of Facts ("SOF") (Dkt. No. 26) at 2-19; Defs.' SOF (Dkt. No. 39) at 3-12).

1. In August 2016, the U.S. Army Medical Material Development Activity ("USAMMDA" or "Army") awarded a prime contract to Adnet (the "Adnet Contract"). The purpose of the contract was to support the Medical Product Development and Acquisition Tool ("MPDAPT") database. The term of the contract was scheduled to, and did in fact, expire on August 31, 2020. Pl.'s SOF ¶ 1, 3; Defs.' SOF ¶ 2.

2.	Adnet hired Rohit Soni, Laura Barr, and Jason Laird in 2016 and 2017 to fill three of the four full-time equivalent ("FTE") personnel positions needed to meet the Army's requirements under the Adnet Contract. Pl.'s SOF ¶ 4.

3.	On or around August 1, 2016, Adnet hired Soni to serve as the Computer Consultant/Web Application Developer-Site Manager on the Adnet Contract and provide support for Adnet's other business. Pl.'s SOF ¶¶ 5-6; Defs.' SOF ¶ 3.

4.	On or around December 5, 2016, Adnet hired Laird to serve as the Computer Consultant/MS-SQL Developer Designer on the Adnet Contract. He was classified as an independent contractor. Pl.'s SOF ¶ 7; Defs.' SOF ¶ 3.

5.	On March 13, 2017, Adnet hired Barr to serve as a Technical Writer in support of the Adnet Contract. Pl.'s SOF ¶ 8; Defs.' SOF ¶ 3.

6.	On October 23, 2018, while employed by Adnet, Soni and Barr incorporated RoLaJa, LLC. Pl.'s SOF ¶ 10.

7.	Laird agreed to support Soni and Barr in finding work for RoLaJa but decided he did not want to be a part owner of the company. Pl.'s SOF ¶ 12.

8.	Neither Soni, Barr, nor Laird ever asked Adnet if their employment with Adnet for work on the Adnet Contract would end on August 31, 2020. Adnet also never informed the defendants it would need their services beyond the anticipated expiration of the Adnet Contract. Pl.'s SOF ¶ 14; Defs.' SOF ¶ 14.

**B.	Transition of Work to General Dynamics Information Technology, Inc.**

9.	By early 2020, the Army had decided to transition the MPDAPT work to General Dynamics Information Technology, Inc. ("GDIT"). Pl.'s SOF ¶ 15.

10. On February 14, 2020, the Army informed GDIT that Adnet was the incumbent performing the MPDAPT contract. Pl.'s SOF ¶ 16.

11. Adnet was never told by GDIT that GDIT would definitively be subcontracting the work to Adnet. Defs.' SOF ¶¶ 12, 13.

12. On April 14, 2020, the Army told GDIT that the government needed a total of four positions for the MPDAPT work. Pl.'s SOF ¶ 17.

13. On June 12, 2020, GDIT contacted Adnet to schedule a meeting. Pl.'s SOF ¶ 18.

14. On June 16, 2020, after meeting with Adnet, GDIT stated that it "definitely [saw] the benefit of having Adnet as part of [its] team going forward" and on June 22, 2020, at GDIT's request, Adnet submitted its initial pricing—or rough order magnitude ("ROM")—for a prospective subcontract with GDIT for MPDAPT work. Pl.'s SOF ¶¶ 19-21.

15. GDIT then submitted to the Army a proposed modification to its prime USAMMDA contract consistent with the information set forth in Adnet's ROM.[1] Pl.'s SOF ¶ 22.

16. On June 23, 2020, Laird contacted GDIT's Program Senior Director, Karen Knickerbocker (née Dickman) on behalf of RoLaJa to discuss GDIT's USAMMDA work set to begin September 1, 2020. Pl.'s SOF ¶ 23.

17. GDIT had not previously worked with RoLaJa. Pl.'s SOF ¶ 26.

18. On July 1, 2020, Laird and Knickerbocker held a call to discuss RoLaJa's capabilities. Pl.'s SOF ¶ 25.

19. The same day, Laird submitted a capability statement for RoLaJa. Pl.'s SOF ¶ 27.

---

[1] The parties dispute whether the numbers submitted by GDIT were based on Adnet's numbers (and whether that had significance) or whether GDIT's numbers were merely placeholders. Defs.' Memo. in Opp. (Dkt. No. 46) at ¶ 22.

20. On July 6, 2020, while continuing its pricing discussion with GDIT, Adnet told GDIT that it maintained a "demo lab" for clients at an annual cost to Adnet of $52,000. Adnet then proposed that GDIT "provide at least half the cost - $26,000.00 annually [for Adnet] to continue to offer the demo room for client convenience" and consider including it as a future line item as part of the charges on the subcontract Adnet was discussing with GDIT. Defs.' SOF ¶ 17; Defs.' Ex. 21.

21. When asked about that proposal from Adnet, Ms. Knickerbocker testified:

We were really concerned about the communications with [Adnet's CEO Mr. Shri Sinha] and the rates and some of the information we received from Adnet that concerned us with what we perceived as overcharging the Government for work on their existing contract and the impact of continuing to over-charge the Government, and so we wanted to give a formal opportunity to compete the requirement. And also, we were concerned about the email that was shown earlier [Defs' Ex. 21] kind of pushing for us to provide support to their facility.

Defs.' SOF ¶ 18; Defs.' Ex. 15, Pl.'s Ex. 5 ("Knickerbocker Dep.") at 71:11-21.

22. On July 7, 2020, Laird held a second call with GDIT. The call included both Knickerbocker and her boss, Julie McGrath. The purpose of the call again was to discuss RoLaJa's capabilities. Pl.'s SOF ¶ 29.

23. Upon receiving RoLaJa's capability statement and holding a meeting with Laird in July 2020, GDIT's program team of Knickerbocker and McGrath learned that RoLaJa's principals were working for Adnet. Pl.'s SOF ¶ 66.[2]

24. GDIT also determined that RoLaJa was qualified to perform the work required by GDIT's prime USAMMDA contract and was interested in RoLaJa as a subcontractor because of

---

[2] It is disputed whether GDIT then took further steps to investigate any potential contractual breaches. This is immaterial to the determination. Ultimately, it is agreed that GDIT decided Adnet could address any potential breaches internally.

4

RoLaJa personnel's current work (through their employment with Adnet) on the MPDAPT contract. Pl.'s SOF ¶¶ 30, 32; Knickerbocker Dep. Tr. at 59:10–20.

25. On July 10, 2020, RoLaJa signed and returned a non-disclosure agreement ("NDA") to GDIT "pertaining to [GDIT's] USAMMDA Strategic Support Services Prime Contract". GDIT returned the fully executed NDA the same day. Pl.'s SOF ¶ 33; Pl.'s Ex. 21.

26. On July 13, 2020, at GDIT's request, Barr submitted RoLaJa's ROM for the MPDAPT work to GDIT. Pl.'s SOF ¶ 34.

27. Later that day, Knickerbocker asked Barr to confirm that RoLaJa's rates were fully burdened. Pl.'s SOF ¶ 35.

28. Barr then sent a text message to Laird, asking for confirmation that the rates RoLaJa submitted in the ROM to GDIT were "fully burdened with g&a and fringe included." Laird stated "[t]hat is a really good sign[.] [GDIT] thinks they are low[.]" Laird further stated that GDIT "must already have Adnet rates [a]nd we are way lower." Pl.'s SOF ¶ 36.

29. Barr then confirmed to Knickerbocker that RoLaJa's submitted rates were fully burdened. Pl.'s SOF ¶ 35.

30. RoLaJa's proposed labor rates were, in fact, significantly lower than the rates Adnet proposed in its ROM. Pl.'s SOF ¶ 37.

31. On July 14, 2020, in connection with its previously submitted ROM, Adnet requested that GDIT provide a copy of its original request for quotation ("RFQ") so that Adnet could evaluate the flow-down clauses implicated by it and "understand GDIT's limitations." Pl.'s SOF ¶ 38; Pl.'s Ex. 27.

32. GDIT responded that it would send over an NDA and that GDIT "[would] initiate the request for formal pricing after the NDA ha[d] been finalized." Pl.'s SOF ¶ 39.

33. On July 20, 2020, Adnet submitted its signed NDA to GDIT. Pl.'s SOF ⁋ 40.

34. On or shortly before July 23, 2020, GDIT decided to compete the MPDAPT subcontract. Pl.'s SOF ⁋ 41.

35. GDIT informed RoLaJa that it would be competing the MPDAPT subcontract. Pl.'s SOF ⁋ 42.[3]

36. Vicki Kordell, GDIT's Subcontracts Manager who handled the subcontracting process for the MPDAPT requirement, testified that in her more than ten years' experience at GDIT she had not competed a subcontract. Pl.'s SOF ⁋ 46; Pl.'s Ex. 7 (Kordell Dep. Tr.) at 50:25-51:16.

37. On August 6, 2020, GDIT issued to Adnet, RoLaJa, and C2i a "competitive RFP for the MPDAPT Services" and requested proposals by August 12, 2020. C2i did not submit a proposal. Pl.'s SOF ⁋⁋ 49-52.

38. The RFP explained the evaluation criteria:

This proposal will be evaluated on a Best Value Basis. The Award will be based on a tradeoff between price and technical response where price is weighted more heavily than the technical response. Price will be evaluated against other submissions as well as a price reasonableness evaluation[.] The technical response will consist of candidate qualifications as identified in the resumes provided. The initial Technical Evaluation will be pass or fail in accordance with the labor category requirements. If a resume passes this evaluation, the resume will be further [evaluated] equally for education and experience.

Pl.'s SOF ⁋ 53.

---

[3] There is a dispute as to whether Adnet was *aware* that the contract was being competed at the time they entered their bid. It is undisputed that the request was labeled as a "competitive RFP." Defs.' SOF at ⁋ 21-22.

39. On August 10, 2020, Soni told Barr and Laird via text message that he was taking off work because he "did not want [Sinha] to pull [him] into contract work GDIT [*sic*]." In response, Barr texted "LMAO." Pl.'s SOF ¶¶ 54-55.[4]

40. Laird admitted that Sinha had expressed interest in pursuing the GDIT subcontract to all three defendants. Pl.'s SOF ¶ 57.

41. On August 11, 2020, Soni, Barr, and Laird submitted a proposal through RoLaJa to GDIT in response to the RFP. Pl.'s SOF ¶ 58.

42. The proposal identified Soni, Barr, and Laird as incumbent personnel with knowledge and experience relating to USAMMDA and the specific MPDAPT work at issue. The proposal identified Michael Adams, another Adnet employee working on the MPDAPT contract, to fill the fourth FTE position. Pl.'s SOF ¶¶ 59-60.

43. Soni, Barr, and Laird worked together and collaborated on preparing the proposal. Pl.'s SOF ¶ 61.[5]

44. Soni, Barr, and Laird did not inform Adnet that they were seeking MPDAPT work from GDIT or that RoLaJa submitted a proposal in response to GDIT's competitive RFP process, and defendants did not request Adnet's permission to do so. Pl.'s SOF ¶¶ 62-63.

45. On August 12, 2020, Adnet submitted a proposal to GDIT in response to the RFP. Pl.'s SOF ¶ 64.

46. GDIT notified RoLaJa of its selection for the subcontract on August 13, 2020. Pl.'s SOF ¶ 69.

---

[4] Soni's text and Barr's text are immaterial, as their motives are immaterial in the determination of breach of loyalty. If the defendants were competing for future employment and did not disturb a business relationship with an existing client, whether they found the situation funny is not relevant.

[5] There is a dispute as to whether these actions were by Soni, Barr, and Laird working only as agents of RoLaJa. This is immaterial.

7

47. The MPDAPT subcontract was fully executed by GDIT and RoLaJa on September 11, 2020. GDIT's prime contract with USAMMDA, including the MPDAPT work subcontracted to RoLaJa, will last at least until September 30, 2022. Pl.'s SOF ¶¶ 70-71.

## II. LEGAL STANDARD

Summary judgment is proper where, viewing the facts in a light most favorable to the non-moving party, there remains no genuine issue of material fact. Fed. R. Civ. P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986); *Evans v. Tech. Apps. & Servs. Co.*, 80 F.3d 954, 958-59 (4th Cir. 1996). A party opposing a motion for summary judgment must respond with specific facts, supported by proper documentary evidence, showing that a genuine dispute of material fact exists and that summary judgment should not be granted in favor of the moving party. *Anderson*, 477 U.S. at 250. As the Supreme Court has held, "the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Bouchat v. Baltimore Ravens Football Club, Inc.*, 346 F.3d 514, 519 (4th Cir. 2003) (quoting *Anderson*, 447 U.S. at 247-48) (emphasis in original). A dispute over an issue of material fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 446 U.S. at 248.

## III. DISCUSSION

Adnet moves for summary judgment on all three counts alleged in its Complaint: Breach of Duty of Loyalty (Count I); Tortious Interference with a Business Relationship (Count II); and Conspiracy (Count III). *See* Pl.'s Motion (Dkt. No. 25). Defendants similarly move for summary judgment on all three counts of the Complaint. *See* Defs.' Motion (Dkt. No. 38).

### A. Count I (Breach of Duty of Loyalty) as to Defendants Soni and Barr

Adnet argues that there were three breaches of defendants' fiduciary duty of loyalty: (1) when defendants "caused GDIT to compete the subcontract work"; (2) when Laird contacted GDIT to express RoLaJa's interest in securing MPDAPT work from GDIT; and (3) when RoLaJa actually competed against Adnet in responding to GDIT's competitive RFP. *See* Pl.'s Br. (Dkt. No. 26) at 20-21. For the reasons that follow, the Court finds that none of these alleged acts or series of acts violated the duty of loyalty under Virginia law.

The duty of loyalty is a fiduciary duty. *See Williams v. Dominion Tech. Partners, LLC*, 265 Va. 280, 289 (Va. 2003). In Virginia, "[t]he elements of a claim for breach of fiduciary duty are (1) a fiduciary duty, (2) breach, and (3) damages resulting from the breach." *Informatics Applications Grp., Inc. v. Shkolnikov*, 836 F. Supp. 2d 400, 424 (E.D. Va. 2011) (citing *Carstensen v. Chrisland Corp.*, 247 Va. 433, 444 (Va.1994)).

The Virginia Supreme Court established its approach to claims of breach of fiduciary duty in *Williams*:

> We have long recognized that under the common law an employee, including an employee-at-will, owes a fiduciary duty of loyalty to his employer during his employment. *See, e.g.*, *Horne v. Holley*, 167 Va. 234, 241 (Va. 1936). Subsumed within this general duty of loyalty is the more specific duty that the employee not compete with his employer during his employment. *Hilb, Rogal & Hamilton Co. of Richmond v. DePew*, 247 Va. 240, 249 (Va. 1994). Nonetheless, in the absence of a contract restriction regarding this duty of loyalty, an employee has the right to make arrangements during his employment to compete with his employer after resigning his post. The employee's right in such circumstances is not absolute. Rather, "[t]his right, based on a policy of free competition, must be balanced with the importance of the integrity and fairness attaching to the relationship between employer and employee." *Feddeman & Co. v. Langan Assocs., P.C.*, 260 Va. 35, 42 (Va. 2000). Thus, "[u]nder certain circumstances, the exercise of the right may constitute a breach of fiduciary duty. . . . Whether specific conduct taken prior to resignation breaches a fiduciary duty requires a case by case analysis." *Id*.

265 Va. At 289.

In *Williams*, the Court specified that an employee "must not have 'misappropriated trade secrets, misused confidential information, [or] solicited an employer's clients or other employees prior to termination of employment.'" *Id*. (quoting *Feddeman & Co*., 260 Va. At 42).

Here, as at-will employees of Adnet, Soni and Barr owed a duty of loyalty to their employer. The issue to resolve at this stage is whether the undisputed material evidence establishes that there was a breach of that duty. And that inquiry is a narrow one because Adnet does not allege misappropriation of trade secrets or the misuse of confidential information. Therefore, the only question before the Court is whether defendants solicited plaintiff's clients or other employees prior to their own termination of employment.

Virginia Courts have distinguished arrangements for future employment or competition, which are allowable (*see e.g.*, *Williams*, 265 Va. 280) from active solicitation of an employer's current clients, which are not (*see e.g.*, *Feddeman*, 260 Va. 35; *Hair Club for Men, LLC v. Ehson*, No. 1:16-cv-236, 2016 U.S. Dist. LEXIS 118069 (E.D.Va. 2016)). Active solicitation alone is not enough, however; the solicitation must also be directed at *current* clients of the employer. *See Contract Assocs. v. Atalay,* No. 1:14-cv-882, 2015 U.S. Dist. LEXIS 48129, at *12 (E.D. Va. 2015) ("it appears that only the pre-termination solicitation of an employer's existing clients has been held as sufficient to establish breach of fiduciary duties").

*Williams v. Dominion Technology Partners* is directly on point. 265 Va. 280. Defendant Donald Williams was hired by Dominion Technology Partners, LLC ("Dominion"), a firm that recruited and placed computer consultants, as at-will employees. *Id.* at 283. Dominion did not require Williams to enter into a non-competition agreement. *Id.* Dominion contracted with ACSYS Information Technology, Inc. ("ACSYS") to place Williams in a position with Stihl, Inc. ("Stihl") as a computer consultant under a month-by-month contract. *Id.* at 283-84. Williams was paid $80 per hour in his position, but Stihl paid ACSYS $165 per hour for the work, and ACSYS, in turn, paid Dominion $115 per hour for Williams's work. *Id.* at 285. After learning of this discrepancy, Williams

sought to end his month-by-month contract with Dominion and, *while still employed by Dominion*, discussed potential direct employment with ACSYS to maintain his work with Stihl at $100 per hour. *Id.* at 285-86 (emphasis added). That conversation between Williams and ACSYS arose while they discussed Stihl's potential future needs for someone with Williams's skills. *Id.* at 285. Soon thereafter, Williams gave Dominion the requisite 30 days' notice, terminated his employment with Dominion, and continued his work for Stihl as a direct ACSYS employee. *Id.* at 287.

The Virginia Supreme Court, upon review of the case, found that Williams had the right to resign from his employment and to seek higher compensation, which included planning for future employment while working for Dominion. *Id.* at 291. The Court further found that Williams's and ACSYS's knowledge of the fact that Stihl would need someone with Williams's capabilities in the future was not a trade secret; it was no more than a business opportunity or lead. *Id.* Accordingly, while Williams could not take actions that were "disloyal or unfair to Dominion," his efforts to secure work directly through ACSYS "did not rob his employer of any objective or tangible business opportunity or expectancy." *Id.* at 291-92.

Moreover, Williams did not poach Dominion's relationship with ACSYS or Stihl because Dominion had "nothing more than 'a subjective belief or hope that the business relationship[] would continue and merely a possibility that future economic benefit would accrue to it.'" *Id.* at 292 (citing *Commercial Business Systems, Inc. v. Halifax Corp.*, 253 Va. 292, 393 (Va. 1997)). Rather, Dominion received "all the benefits for which it had bargained" when Williams provided reasonable notice of his intent to resign his post, thereby permitting Dominion to fulfill its obligation to ACSYS under their month-to-month agreement. *Id.* The Virginia Supreme Court refused to reach a contrary conclusion "because the law will not provide relief to every 'disgruntled player in the rough-and-tumble world comprising the competitive marketplace,' especially where, through more prudent business practices, the harm complained of could easily have been avoided" (such as through the use of non-compete

agreements). *Id.* at 290 (quoting *ITT Hartford Group, Inc. v. Virginia Financial Assocs., Inc.*, 258 Va. 193 (1999)).

Plaintiff cannot distinguish the facts in *Williams* from the undisputed facts in this case. In the instant case, the defendants were similarly preparing for work *after* their employment with Adnet was scheduled to end. The defendants worked with Adnet on the USAMMDA contract, which had a set termination date of August 31, 2020. Pl.'s SOF ¶ 3. There is no evidence in the record that Adnet told the defendants that they would have a job with Adnet after August 31, 2020. Pl.'s SOF ¶ 14; Defs.' SOF ¶ 14. Just as in *Williams,* where the defendant, who, while employed by Dominion, arranged employment for the period after his departure from his at-will employment, defendants here worked to win a contract with GDIT that would only begin *after* their contractual obligations to Adnet had been fully performed.

The facts here weigh even more strongly in defendants' favor, as Adnet had no pre-existing relationship with GDIT, whereas Dominion had a pre-existing month-to-month contract with ACSYS. *See* Pl.'s SOF ¶¶ 15, 18. Plaintiff argues that defendants initiated the competitive bidding process, thereby extinguishing the all-but-certain likelihood that Adnet would have secured GDIT's subcontract without competition. *See, e.g.*, Pl.'s Memo. in Opp. (Dkt. No. 57) at 14-16. It is unnecessary to resolve this issue, however, because even if defendants had caused the competition, they were justified in doing so to seek future employment after their contracts were set to end. *Williams*, 265 Va. at 289 ("in the absence of a contract restriction regarding this duty of loyalty, an employee has the right to make arrangements during his employment to compete with his employer after resigning his post"). Just as Williams had the right to discuss employment with ACSYS in the future while employed by Dominion, defendants had the right to discuss future employment (or subcontracting) with GDIT, especially in light of the fact that GDIT had no pre-existing relationship with Adnet.

These facts also stand in stark contrast to *Feddeman*, the primary case plaintiff argues should control. *See, e.g.*, Pl.'s Reply (Dkt. No. 59) at 1-2. In *Feddeman*, directors and employees of Feddeman

& Company ("Feddeman") offered a buyout of president Kent Feddeman's 95% interest in Feddeman & Company, and the parties entered into negotiations. When negotiations stalled, the directors and employees threatened to resign en masse and go to work for a rival company, Langan Associates, if the offer was not accepted. *Id.* at 43. They knew that this would "be devastating" to Feddeman and used the threat of resignations "as a means of exerting leverage" to accept the offer. *Id.* at 45. The offer was rejected, and the directors and employees ultimately resigned, went to Langan Associates, contacted all of Feddeman's clients, and ultimately persuaded 50% of Feddeman's clients to move to Langan Associates. *Id.* at 41. The Court found that "injury to the plaintiff was a known and intended result of the plan." *Id.* at 45.

The facts in *Feddeman* turn on conduct related to existing business relationships and are totally distinct from the facts at issue in the instant case. Importantly, Adnet did not have an existing contractual or client relationship with GDIT that was disturbed by RoLaJa's entrance into the market. Adnet was scheduled to lose its prime contract with the Army, and the company had not yet established a relationship with GDIT for a future subcontract. *See* Pl.'s SOF ¶ 3; Defs.' SOF ¶¶ 12, 13. The defendants did not know concrete injury would occur, as it did in *Feddeman*, because Adnet had not yet competed for or won any contract with GDIT, nor was Adnet ever guaranteed to be awarded the contract. Defs.' SOF ¶¶ 12, 13. There is no evidence in the record that Adnet had ever contracted with GDIT or had any prior relationship with GDIT. *See* Pl.'s SOF ¶ 15. In short, GDIT was neither a client nor customer of Adnet. Nor is there evidence that GDIT was certain to become one. GDIT could have kept the work in-house and not subcontracted the work, or competed the work, as it ultimately decided to do. Pl.'s SOF ¶ 41.

Regardless, Adnet argues that but for the actions of the defendants, Adnet would have received the contract. *See* Pl.'s Br. at 20. But there is simply insufficient evidence that defendants caused GDIT to compete the contract. The record clearly reflects that GDIT made no promises to Adnet and that

13

concerns with Adnet's pricing prompted GDIT to compete the bid. *See* Defs.' SOF ¶¶ 17, 18. Adnet has submitted no evidence to contradict this testimony.

The potential subcontract between GDIT and Adnet, therefore, was not a tangible expectancy, but rather just a hope, as in *Williams*. 265 Va. At 292 (Dominion had "nothing more than 'a subjective belief or hope that the business relationships would continue and merely a possibility that future economic benefit would accrue to it.'") (quoting *Commercial*, 253 Va. At 393).

Even if Adnet could demonstrate that defendants were engaged in active solicitation, rather than preparation for future employment or competition, Adnet has not shown that the active solicitation was aimed at a *current* client, as GDIT had no existing relationship with Adnet. For these reasons, plaintiff's motion for summary judgment on the claim of breach of duty of loyalty will be denied and defendants' motion will be granted.

### B. Count II (Tortious Interference with Business Relationship) as to all Defendants

The claim of tortious interference with a business relationship has four elements: "(1) the existence of a valid contractual relationship or business expectancy; (2) knowledge of the relationship or expectancy on the part of the interferor; (3) intentional interference inducing or causing a breach or termination of the relationship or expectancy; and (4) resultant damage to the party whose relationship or expectancy has been disrupted." *Chaves v. Johnson*, 230 Va. 112, 120 (Va. 1985). When a contract is terminable at will, the Plaintiff must also show that the defendant employed "improper methods" when interfering with the contract. *Duggin v. Adams*, 234 Va. 221, 226-27 (Va. 1987) (quoting *Hechler Chevrolet*, 230 Va. 396, 402 (Va. 1985)). Improper methods can be established by showing that the action was "illegal, independently tortious, or violates an established standard of trade or profession." *Dunn, McCormack & MacPherson v. Connolly*, 281 Va. 553, 559 (Va. 2011). This includes a breach of fiduciary relationship. *Id.* (citing *Duggin*, 234 Va. At 226-27).

To establish the first element of a valid business expectancy, plaintiff must show a "'probability' of future economic benefit," which is a fact-intensive inquiry. *L-3 Communs. Corp. v. Serco, Inc.*, 926 F. 3d 85, 94 (4th Cir. 2019) (citing *Halifax Corp.*, 253 Va. At 300). A mere "possibility" that a future economic benefit will accrue is insufficient. *Id.* "'[M]ere proof of a plaintiff's belief and hope that a business relationship will continue is inadequate to sustain'" a business expectancy. *Id.*

In the instant case, Adnet has failed to establish the existence of a valid contractual relationship or business expectancy with GDIT. While plaintiff cites *L-3 Communs. Corp.* for support, the instant case is critically distinguishable. 926 F.3d 85. In *L-3 Communs.Corp.*, the Air Force awarded a contract to Serco (the prime), who then entered into a subcontract with Titan Corporation (the predecessor to L-3). *Id.* at 89. Serco awarded every task order issued under the prime contract to L-3 and its predecessors between December 2004 and June 2009. *Id.* In July 2009, Serco began awarding task orders to Jaxon, which was owned by a longtime L-3 employee. *Id.* Plaintiff sued alleging tortious interference with a business expectancy. The Fourth Circuit held that the course of dealing between the parties over their five-year business history should have been considered to determine whether there was a probability of a future economic benefit. *Id.* at 95.

In this case, there was no course of dealing or business history between Adnet and GDIT that would have established the basis to determine whether there was a probability of a future award. Adnet performed work for USAMMDA on the MPDAPT contract as a prime. Pl.'s SOF ¶¶ 1-3. That work was scheduled to end as of August 31, 2020, and GDIT had been awarded the prime contract thereafter. Pl.'s SOF ¶¶ 3, 15. USAMMDA did not promise any subcontracting work to Adnet and did not know how GDIT would award the work. Defs' SOF ¶ 12, 13. There is

15

no evidence in the record that GDIT ever intended to award a subcontract to Adnet. In fact, GDIT had the power to keep the work in-house and not sub-contract it out at all. Because of the lack of established relationship between GDIT and Adnet, there is no evidence in the record that demonstrates a probability of a business expectancy that would have resulted in a guaranteed award of the contract to Adnet.

Additionally, for the reasons stated in Section I above, Adnet's failure to establish its breach of loyalty claim, its only argument for the use of improper methods, also means Adnet is unable to establish tortious interference. *See Williams*, 265 Va. At 289. For these reasons, plaintiff's motion for summary judgment on the count of intentional or tortious interference with business relationship will be denied and defendants' motion will be granted.

C. **Count III (Business Conspiracy) as to all Defendants**

Civil liability for business conspiracy may be imposed when "any two or more persons who shall combine, associate, agree, mutually undertake or concert together for the purpose of willfully and maliciously injuring another in his reputation, trade, business, or profession by any means whatsoever." Va. Code 18.2-499. In order to sustain a claim for statutory business conspiracy, the plaintiff must prove by clear and convincing evidence that the defendants acted with legal malice, that is, proof that the defendants acted intentionally, purposefully, and without lawful justification, and that such actions injured the plaintiff's business. *See Feddeman*, 260 Va. at 44. Having failed to establish a breach of the duty of loyalty with respect to Count I or the the use of improper methods with respect to Count II, Adnet cannot meet its burden under Count III to show that defendants' actions were taken with legal malice and without lawful justification. Because Adnet has failed to demonstrate a breach of the duty of loyalty, there was no unlawful action that could be the object of a conspiracy. Adnet itself represented that without the breach of

duty of loyalty claim, the other counts fall as well. Aug. 6, 2021 Hearing Tr. at 11:00:19. For these reasons, and for good cause, the motion for summary judgment on the count of business conspiracy will be denied and defendants' motion will be granted.

### IV. CONCLUSION

For the foregoing reasons, plaintiff's motion for summary judgment will be denied in its entirety. Defendants' motion for summary judgment will be granted in its entirety.

An appropriate Order shall issue.

September 17, 2021  
Alexandria, Virginia

/s/  
Michael S. Nachmanoff  
United States Magistrate Judge