**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

---

**No. 21-2182**

---

ADNET, INC.,

       Plaintiff – Appellant,

  v.

ROHIT SONI; LAURA BARR; JASON LAIRD,

       Defendants – Appellees.

---

Appeal from the United States District Court for the Eastern District of Virginia, at Alexandria.  Michael Stefan Nachmanoff, District Judge.  (1:21-cv-00130-MSN)

---

Argued:  January 26, 2023                       Decided:  April 27, 2023

---

Before WILKINSON, AGEE and WYNN, Circuit Judges.

---

Reversed in part, vacated in part, and remanded by published opinion. Judge Agee wrote the opinion, in which Judge Wilkinson and Judge Wynn joined. Judge Wilkinson wrote a concurring opinion.

---

**ARGUED:**  James Yarnell Boland, VENABLE LLP, Tysons Corner, Virginia, for Appellant.  Palak Vinod Patel, JAYARAM LAW, Chicago, Illinois, for Appellees.  **ON BRIEF:** Nicholas M. DePalma, Caleb E. McCallum, VENABLE LLP, Tysons Corner, Virginia, for Appellant.  Vivek Jayaram, Elizabeth Austermuehle, Zahreen Ghaznavi, Michael Nosanchuk, JAYARAM LAW, Chicago, Illinois, for Appellees.

AGEE, Circuit Judge:

While working for Adnet, Inc. ("Adnet"), Rohit Soni, Laura Barr, and Jason Laird (collectively, "Defendants") learned of a subcontract that Adnet was attempting to win. Thereafter, Defendants, through their own company, submitted a bid for that same subcontract. After Defendants won the subcontract, Adnet brought claims against them for breach of the duty of loyalty, tortious interference with a business relationship, and business conspiracy. The district court granted Defendants' motion for summary judgment, concluding that Defendants did not compete against Adnet, that Adnet did not have a business expectancy in the subcontract, and that, without proof of an underlying tort, there was no business conspiracy. Adnet appeals. For the following reasons, we reverse in part and vacate in part the district court's grant of summary judgment and remand for further proceedings.

I.

In August 2016, the Army awarded Adnet a contract to develop certain computer software. Adnet hired Soni and Barr as employees and Laird as an independent contractor to work on that software. Defendants were not subject to any restrictive covenants. On October 23, 2018, while employed by Adnet, Defendants incorporated their own company, RoLaJa, LLC ("RoLaJa").

Adnet's contract with the Army was set to expire, with no option to renew, on August 31, 2020. After that date, the Army planned to transition the software-development work to General Dynamics Information Technology ("GDIT"). The Army

2

was not allowed to direct GDIT on how to meet the deliverables required for the contract, but informed GDIT that four qualified individuals were necessary to perform the software work and that Adnet was the incumbent currently performing the work.

On June 12, 2020, GDIT contacted Adnet to schedule a meeting to discuss "potential teaming" on the new contract. J.A. 68. After the meeting, GDIT's Program Senior Director, Karen Knickerbocker, emailed Adnet, stating that she "definitely s[aw] the benefit of having Adnet as part of [GDIT's] team going forward" and planned to initiate "the process" with GDIT's subcontracts manager.[1] J.A. 407. She ended her email, "I look forward to working with you and having you part of the team." J.A. 407.

As requested by GDIT, Adnet then submitted a rough order of magnitude ("ROM") to GDIT, providing Adnet's initial pricing estimate for the subcontracting work. GDIT included Adnet's pricing estimate in its proposed contract to the Army, which the Army approved. At some point thereafter, Adnet's CEO informed its employees, including Defendants, about the subcontract.

On June 23, 2020, Laird sent an unsolicited email to Knickerbocker on behalf of RoLaJa to inform her of RoLaJa's interest in the subcontract. About a week later, Laird and Knickerbocker held a call to discuss RoLaJa's ability to perform under the subcontract, and Laird submitted a capability statement to GDIT. Adnet was unaware that

---

[1] Although the email did not define "the process," the inference from context is that Knickerbocker was referring to starting the process of awarding Adnet the subcontract. *See* J.A. 407.

Defendants reached out to GDIT or that GDIT was considering other potential subcontractors.

On July 6, 2020, during further pricing discussions with GDIT, Adnet informed GDIT that it maintained a "demo lab" for clients at an annual cost of $52,000. J.A. 405. Adnet proposed that GDIT provide at least half the cost annually as part of its subcontract award.

The next day, Laird held a second call with GDIT to again discuss RoLaJa's capabilities. GDIT determined that RoLaJa was qualified to perform the work required by the subcontract and it was interested in RoLaJa as a subcontractor—partly due to Defendants' work on the software at Adnet. Then, on July 13, 2020, RoLaJa submitted a ROM to GDIT at GDIT's request. Later that day, Knickerbocker reached out to ask Barr to confirm that RoLaJa's rates were fully burdened, meaning that they included all overhead, general, and administrative costs. Barr confirmed that they were. Laird texted Barr that this was "a really good sign[.] [GDIT] thinks [our rates] are low." J.A. 436. He also stated that GDIT "must already have Adnet['s] rates [a]nd we are way lower." J.A. 436.

On July 23, 2020, GDIT decided to compete the subcontract—meaning that GDIT switched from a sole-source negotiation, where they only considered one company's bid, to a competitive process, in which multiple companies would be allowed to bid for the subcontract. GDIT's subcontracts manager, Vicki Kordell, who handled the subcontract at issue, testified that GDIT generally did not compete subcontracts of this type but when it had two qualified companies able to perform the work equally well, it was required to

4

do so. In her more than ten years' experience at GDIT, Kordell had never before competed a subcontract.

At depositions, Knickerbocker explained that GDIT decided to compete the contract because:

> We were really concerned about the communications with [Adnet's CEO] and the rates and some of the information we received from Adnet that concerned us with what we perceived as over-charging the Government for work on their existing contract and the impact of continuing to over-charge the Government, and so we wanted to give a formal opportunity to compete the requirement. And also, we were concerned about the email . . . kind of pushing for us to provide support to their facility. And then we also discussed, obviously, we also discussed the situation around RoLaJa, but [*sic*] that it was an existing business that we could afford an opportunity to[.]

J.A. 187.

On August 6, 2020, GDIT issued a "competitive" request for proposal (RFP) for the subcontract to Adnet and RoLaJa and requested proposals by August 12, 2020.[2] J.A. 449. As part of the proposals, GDIT required resumes of the individuals who would be working on the software. The instructions explained that the proposals' prices would be "evaluated against other submissions." J.A. 455.

On August 11, 2020, RoLaJa submitted a proposal to GDIT.[3] On August 12, 2020, Adnet did the same but failed to provide resumes. On August 13, 2020, GDIT

---

[2] GDIT also issued an RFP to a company called C2i, which did not submit a proposal.

[3] Notably, on August 10, 2020, Soni texted Barr and Laird that he was taking off work because he "did not want [Adnet's CEO] to pull [him] into contract work [for] GDIT." J.A. 456. Barr responded "L[aughing ]m[y ]a[ss ]o[ff]." J.A. 456.

awarded RoLaJa the subcontract and informed Adnet that its proposal was not selected because it was "noncompliant" for failing to provide resumes. J.A. 80. GDIT refused to accept an amended proposal from Adnet because all proposals were due on August 12, 2020, and Adnet missed the deadline. Adnet terminated Defendants' employment the next day.

In January 2021, Adnet brought an action against Defendants, alleging three Virginia state-law claims.[4] It asserted that Soni and Barr breached their duty of loyalty to Adnet and that all Defendants tortiously interfered with Adnet's business relationship and committed business conspiracy. Thereafter, Adnet and Defendants both moved for summary judgment on all counts.

The district court denied Adnet's motion and granted Defendants' motion in its entirety. *See Adnet, Inc. v. Soni*, No. 1-21-cv-00130-MSN, 2021 WL 4243424, at *5 (E.D. Va. Sept. 17, 2021).  It reasoned that Adnet could not demonstrate a breach of the duty of loyalty because Adnet had no existing relationship with GDIT and, even if it did, Defendants were merely preparing to compete after their employment with Adnet ended—conduct that does not amount to a breach of the duty of loyalty. The district court then dismissed Adnet's tortious interference claim because it found no evidence of a valid contractual relationship or business expectancy with GDIT. Finally, without

---

[4] Adnet originally brought this action in Virginia circuit court but Defendants removed it to federal district court. There is diversity jurisdiction over the parties because Adnet is a Virginia corporation, Defendants are Maryland citizens, and the amount in controversy exceeds $75,000. *See* 28 U.S.C. § 1332.

evidence of an underlying predicate tort, it determined that Adnet could not prove the necessary elements of a business conspiracy claim.

Adnet timely appealed and challenges each of the district court's rulings. First, it argues that the district court erroneously granted summary judgment on its breach of the duty of loyalty claim because it both misapplied the relevant law and mistakenly added an element to the claim. Had the district court applied the correct legal principles, Adnet contends that it would have concluded that there is sufficient evidence of a breach of the duty of loyalty such that granting summary judgment was inappropriate. Second, as to the tortious interference claim, Adnet contends that it provided sufficient evidence of probable future economic benefit from the subcontract that it would have realized absent Defendants' intentional misconduct. Third, because Adnet posits that there is evidence of both a breach of the duty of loyalty and tortious interference with a business relationship, it contends the district court erred by granting Defendants summary judgment on its conspiracy claim as well. We address each argument in turn.[5]

## II.

We review the district court's grant of summary judgment de novo. *Belmora LLC v. Bayer Consumer Care AG*, 987 F.3d 284, 291 (4th Cir. 2021). "Summary judgment is appropriate when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law." *Id.* (citation omitted). Where the district court

---

[5] We have jurisdiction over the appeal under 28 U.S.C. § 1291.

disposes of cross-motions for summary judgment, we consider each motion separately, resolving all factual disputes in the light most favorable to the party opposing that motion. *Id.*

Because Adnet's claims arise under Virginia law, we must apply the applicable state law and determine how the Supreme Court of Virginia would decide this case. *Whitmire v. S. Farm Bureau Life Ins. Co.*, 52 F.4th 153, 157 (4th Cir. 2022).

## III.

Adnet first argues that the district court made two significant legal errors in determining that Defendants did not breach their duty of loyalty: (1) the district court incorrectly limited the duty of loyalty to only three situations, and (2) it inaccurately required Adnet to prove it had an objective business expectancy in the subcontract as part of its claim. As a consequence, Adnet argues that these mistakes led the district court to erroneously conclude that Adnet failed to provide sufficient evidence that Defendants breached their duty of loyalty.[6] We agree and address these arguments seriatim.

### A.

The district court erred by limiting the circumstances in which a breach of the duty of loyalty can occur. In Virginia, to demonstrate a breach of a fiduciary duty, the plaintiff must show: (1) a fiduciary duty; (2) breach; and (3) damages resulting from the breach. *Carstensen v. Chrisland Corp.*, 442 S.E.2d 660, 666 (Va. 1994). An employee "owes a

---

[6] Because Adnet only brought this claim against Soni and Barr, "Defendants" throughout Section III refers only to them and does not include Laird.

fiduciary duty of loyalty to his employer during his employment" in Virginia. *Williams v. Dominion Tech. Partners, L.L.C.*, 576 S.E.2d 752, 757 (Va. 2003). "Subsumed within this general duty of loyalty is the more specific duty that the employee not compete with his employer during his employment." *Id.*

In *Williams*, the Virginia Supreme Court noted three circumstances in which an employee breaches his duty of loyalty: when he misappropriates trade secrets, misuses confidential information, or solicits an employer's clients or employees before his employment ends. *Id.* at 758. However, the court specifically explained that these circumstances are simply examples of situations that "clearly constitute a breach of the duty of loyalty" and are "*by no means exhaustive*." *Id.* (emphasis added). Instead, a plaintiff can show a breach through other circumstances on a "case by case" basis. *Id.*

Purporting to apply *Williams*, the district court stated that the inquiry before it was "narrow" "because Adnet does not allege misappropriation of trade secrets or the misuse of confidential information." *Adnet*, 2021 WL 4243424, at *5. The district court then stated that "*the only question*," therefore, was "whether defendants solicited plaintiff's clients or other employees prior to their own termination of employment." *Id.* (emphasis added).

But *Williams* in no way limited the circumstances in which a breach of the duty of loyalty can occur. As noted, the Virginia Supreme Court explicitly stated the opposite— that the listed circumstances in *Williams* were merely *examples* of when a breach could occur. The district court, therefore, erred by requiring Adnet to fall into one of those

delineated examples in order to succeed on its breach of the duty of loyalty claim. As a consequence, this error alone warrants remand to the district court.

## B.

In addition to erroneously limiting the circumstances in which a breach of the duty of loyalty can occur, the district court also mistakenly added an element to this claim. The district court held that Adnet could not demonstrate a breach of the duty of loyalty because it did not have an objective business expectancy in GDIT's subcontract. However, whether Adnet had such an expectancy is irrelevant because there is no objective business expectancy element for a breach of loyalty claim in Virginia.

For its incorrect proposition, the district court again relied on *Williams*, but that reliance was misplaced. There, Williams worked for Dominion Technology Partners, LLC ("Dominion") as an at-will hourly employee. 576 S.E.2d at 754. Dominion was an employment firm specializing in recruiting and placing qualified computer consultants with various companies. *Id.* at 753. It contracted with a company called ACSYS to place Williams at Stihl, where he provided computer contract work on a month-to-month basis. *Id.* at 754.

After working at Stihl through Dominion for some time, Williams informed an ACSYS employee that Dominion had experienced a change in management, and Williams wanted to end his employment with Dominion due to personality conflicts with that management. *Id.* at 755. Williams knew through his employment with Stihl that it would need someone to work on a new software update and Williams wanted to continue working there, but not through Dominion. *Id.* After determining that neither of their

10

contracts prohibited it, ACSYS agreed to hire Williams and facilitate his placement at Stihl. *Id.* at 755–56. Williams provided Dominion his required thirty days' notice, completed all contractual obligations, and then quit. *Id.* Dominion inquired with ACSYS about filling Williams' position with someone else, but ACSYS indicated that there was no opportunity for them to do so. *Id.* at 756. ACSYS thereafter employed Williams, and he continued to work at Stihl. *Id.*

Dominion brought an action against Williams, alleging a breach of the duty of loyalty, tortious interference with a business relationship, and business conspiracy. *Id.* The Virginia Supreme Court rejected Dominion's claims without addressing each one separately, reasoning that the claims were interrelated. *Id.* at 757. The court explained that "Williams had the right to make the necessary arrangements to resign from his employment with Dominion in such a way as to take advantage of a higher level of compensation if his services at Stihl were needed beyond the month-to-month arrangement then in place, so long as these arrangements were not disloyal or unfair to Dominion." *Id.* at 758. And, as there was no contractual bar to their actions, Williams' decision to safeguard his own interests was not improper. This was especially so because Dominion's relationship with ACSYS "provided it with nothing more than 'a subjective belief or hope that the business relationship[s] would continue and merely a possibility that future economic benefit would accrue to it.'" *Id.* (alteration in original) (citing *Com. Bus. Sys., Inc. v. Halifax Corp.*, 484 S.E.2d 892, 898 (Va. 1997)).

The district court heavily relied on this last quote to support its conclusion that Adnet could not prove a breach of the duty of loyalty without having an objective

business expectancy in the GDIT subcontract. But this reliance ignores the context and claim in which the statement was written. As noted, the *Williams* court considered Dominion's breach of the duty of loyalty and tortious interference claims within the same discussion, but only a claim for tortious interference with a business relationship requires the plaintiff to demonstrate "the existence of a business relationship or expectancy, with a probability of future economic benefit to [the] plaintiff." *Id.* at 757 (citation omitted). Thus, the court's "possibility that future economic benefit would accrue" discussion related to Dominion's tortious interference claim, not its breach of the duty of loyalty claim. *Id.* at 758 (citation omitted). No Virginia case provides to the contrary.

In fact, the case on which the *Williams* court relied for its statement regarding Dominion's subjective belief or hope that a future benefit would accrue, *Commercial Business Systems, Inc. v. Halifax Corp.*, involved *only* a claim for tortious interference with a business relationship. *See* 484 S.E.2d 892, 896 (Va. 1997). In this context it is clear that the *Williams* court did not add an element to a breach of the duty of loyalty claim; it merely failed to separate its discussion of distinct claims. The district court erred by interpreting it in any other way and requiring Adnet to prove an objective business expectancy as an element of its breach of the duty of loyalty claim.

## C.

Applying the correct legal principles, there is sufficient evidence that Defendants breached their duty of loyalty to Adnet such that a jury could find for Adnet. Accordingly, summary judgment to Defendants was inappropriate.

As noted, an employee cannot compete with his employer during his employment. Although this prohibition appears simple enough, what exactly constitutes competition is more complex. Undoubtedly, without a restriction specifying otherwise, "an employee has the right to make arrangements during his employment to compete with his employer after resigning his post." *Williams*, 576 S.E.2d at 757. "He is not, however, entitled to solicit customers for such rival business before the end of his employment nor can he properly do other similar acts in direct competition with the employer's business." Restatement (Second) of Agency § 393 (Am. Law. Inst. 2023).[7] Finding the line between preparing for termination and direct competition requires balancing the desire for a competitive marketplace and "the importance of the integrity and fairness" in the employer-employee relationship. *Williams*, 576 S.E.2d at 757 (citation omitted).

Although the point at which an employee crosses into direct competition is not always precise, there is competent evidence that Defendants traversed that line here. To argue to the contrary, Defendants rely on *Williams*, discussed above. But, once more, their reliance on *Williams* falls short.

Defendants' competition with Adnet was more direct than the conduct involved in *Williams*. After learning of the new subcontract through their employment,[8] Defendants

---

[7] The Virginia Supreme Court consistently relies on the Restatement of Agency. *See, e.g.*, *Hilb, Rogal & Hamilton Co. of Richmond v. DePew*, 440 S.E.2d 918, 923 (Va. 1994).

[8] Defendants assert that they learned about the subcontract on their own but there is no record evidence to support this contention. Not only do Defendants fail to provide evidence of where else they could have learned this confidential information, but their (Continued)

reached out unsolicited to GDIT and offered to perform the same services they knew Adnet was offering to perform.[9] By reaching out to and informing GDIT that Defendants could perform the work, they first caused GDIT to compete the subcontract. *See infra* Section IV. Then, by submitting the *competitive* proposal to GDIT, Defendants competed against Adnet in the most direct sense of the word. *See Competition*, Black's Law Dictionary (11th ed. 2019) ("[T]he effort or action of two or more commercial interests to obtain the same business from third parties."). Defendants submitted their bid knowing that GDIT would compare its proposal to Adnet's and choose which company to award the subcontract. And Defendants acted in this manner while under a duty of loyalty to Adnet.[10]

---

position is belied by Adnet's CEO's testimony that he told the Defendants about the subcontract. Taken in the light most favorable to Adnet, the Court must assume at this stage that Defendants learned of the contract through their employment with Adnet such that there is at least a genuine dispute of material fact.

[9] Defendants also contend that they did not know that Adnet was competing for the subcontract. Again, substantial evidence contradicts their contention. Specifically, two sets of text messages demonstrate Defendants' knowledge. First, Defendants texted each other when GDIT asked Barr if RoLaJa's rates were burdened. Laird stated that GDIT "must already have Adnet['s] rates [a]nd we are way lower." J.A. 436. Second, Soni informed Barr and Laird that he was skipping work one day to avoid having to work on "contract work [for] GDIT." J.A. 456. Thus, for purposes of summary judgment—where we must construe the evidence in favor of Adnet—Defendants knew Adnet was competing for the subcontract.

[10] And despite Defendants' argument to the contrary, their reaching out to GDIT after learning of the opportunity through Adnet and submitting the competing proposal cannot be considered preparing to compete after employment. Although the work would not begin until after their termination, the competition was winning the subcontract—which occurred while they were employed by Adnet. Indeed, now that Defendants won (Continued)

14

By contrast, in *Williams*, the employee merely switched jobs to Dominion's competitor based on information he learned on his own. He did not reach out to Stihl or actively compete with Dominion for the same position. And, after Williams resigned, Dominion could have reached out directly to Stihl and engaged in a competition with ACSYS to fill the position. But it chose not to, precluding any competition. Conversely, Defendants did not simply apply for jobs with a company that bid against Adnet for the subcontract. Instead, Defendants, through RoLaJa, essentially were the company that bid against Adnet. In that sense, Defendants are more like ACSYS in *Williams*, not Williams himself. *Williams* therefore is not "directly on point," as the district court erroneously concluded. *Adnet*, 2021 WL 4243424, at *6.

At bottom, there is sufficient evidence of a direct competition for the subcontract between Adnet and Defendants while they were working for Adnet to bar a grant of summary judgment to Defendants. A reasonable juror could conclude that employees, like Defendants, breach their duty of loyalty to their employer when they learn of a potential business opportunity through their employment and then participate in a direct competition with their employer for that opportunity while still employed.

Therefore, the district court erred in granting summary judgment to Defendants on Adnet's claim for breach of the duty of loyalty, and its judgment must be reversed.

---

the subcontract, there is no competition. Defendants could have solicited non-Adnet clients while still employed, but that is not what happened here. Instead, they went head-to-head with their employer—while still employed—for business their employer specifically sought.

IV.

Adnet next argues that the district court also erred by concluding that no reasonable jury could find that it had a valid business expectancy with GDIT and therefore erroneously granted summary judgment to Defendants on its claim for tortious interference with a business relationship. Again, we agree.

The elements of tortious interference with a business relationship in Virginia are: "(1) the existence of a business relationship or expectancy, with a probability of future economic benefit to [the] plaintiff; (2) defendant's knowledge of the relationship or expectancy; (3) a reasonable certainty that absent defendant's intentional misconduct, plaintiff would have continued in the relationship or realized the expectancy; and (4) damage to plaintiff." *Williams*, 576 S.E.2d at 757 (citation omitted). When a contract is terminable at will, the plaintiff must also prove that the defendant employed "*improper* methods," *Duggin v. Adams*, 360 S.E.2d 832, 836 (Va. 1987) (citation omitted)— methods that are illegal, independently tortious, or "violate an established standard of a trade or profession," *id.* at 837. Proof of a breach of the duty of loyalty satisfies the improper methods requirement. *Dunn, McCormack & MacPherson v. Connolly*, 708 S.E.2d 867, 870 (Va. 2011).

The parties dispute only the first and third elements, which are related. To demonstrate a probability of future economic benefit, the plaintiff must show more than a "mere 'possibility'" of a benefit. *L-3 Commc'ns Corp. v. Serco, Inc.*, 926 F.3d 85, 94 (4th

16

Cir. 2019) (cleaned up). In other words, "proof of a plaintiff's belief and hope that a business relationship will continue is inadequate." *Id.* (citation omitted).

Adnet argues that the evidence demonstrates a sufficient probability of future economic benefit in the subcontract to bar summary judgment. It points to GDIT's "concrete steps" towards awarding Adnet the subcontract—stating that it would start the process with its subcontracts manager, requesting Adnet's pricing, and using that pricing to secure approved funding from the Army. Opening Br. 50. Adnet also notes that GDIT's subcontracts manager stated that it generally sole-sourced this type of subcontract and had not competed one in her ten years at GDIT. Defendants respond that Adnet did not have a business expectancy in the subcontract and it is not reasonably certain that absent Defendants' conduct GDIT would have awarded Adnet the subcontract. They instead contend that GDIT decided to compete the subcontract in part because of Adnet's high prices and request to support its lab—reasons wholly independent of their actions. To support their argument, Defendants rely on *Commercial Business Systems*.

In that case, Commercial Business Systems (CBS) won a contract to repair certain communications equipment for BellSouth for two years. *Com. Bus. Sys.*, 484 S.E.2d at 895. Months before it was time for renewal, a CBS official asked a BellSouth employee about CBS' chances of renewal. The BellSouth employee stated that getting the renewal was "not going to be a problem . . . you guys are one of the best vendors we have . . . . You're doing your work, performing like you're supposed to and you [are] also the incumbent." *Id.* (alterations in original). Thereafter, that BellSouth employee was

replaced by a different employee. *Id.* Simultaneously, CBS began having financial problems, such as issues with cash flow, liabilities exceeding its assets, and having to close certain offices. *Id.* at 897. BellSouth learned of these financial difficulties and the new BellSouth employee did not award CBS the renewal. *Id.* at 895. Instead, the new BellSouth employee awarded it to Halifax who had allegedly bribed the BellSouth employee for the contract. *Id.* at 896.

CBS brought a claim for tortious interference with a business relationship against Halifax. Even though the original BellSouth employee stated that renewal was "not going to be a problem," the court concluded that "at the time the contract was about to expire" the record was "utterly devoid" of evidence of a probability that the contract would have been renewed. *Id.* at 895, 897. For one, the employee who made that statement was no longer the person deciding whether BellSouth would renew the contract. Additionally, CBS' financial problems that occurred months after the statement was made turned CBS into a "tarnished participant in the competition." *Id.* at 897. And there was no credible evidence that BellSouth had a standard practice for continuing to work with incumbent vendors. *Id.* at 898. Thus, the court determined that all CBS had was a subjective belief that BellSouth would renew the contract and therefore did not have a business expectancy in the contract. *Id.*

Defendants argue that *Commercial Business Systems* supports their argument because after Adnet asked GDIT to cover its costs for Adnet's demo lab, it became a "tarnished participant" in the competition. Resp. Br. 50 (quoting *Com. Bus. Sys.*, 484 S.E.2d at 897). Thus, they contend, that the fact that GDIT originally made statements

18

implying that it would award Adnet the subcontract does not matter because the circumstances changed. Defendants also assert that the lack of a business expectancy is clearer here than in *Commercial Business Systems* because GDIT had not previously worked with Adnet and did not know of Adnet until shortly before awarding Defendants the subcontract.

But *Commercial Business Systems* is substantially distinguishable. First, Knickerbocker, the GDIT employee who told Adnet that she would start the process with her subcontracts manager and that she looked forward to working with Adnet, did not switch positions—she was in the same position both when she made these statements and when GDIT decided to compete the subcontract. Second, these statements indicating that Adnet would be awarded the subcontract were made during the subcontracting process, not months before, making Adnet's business expectation more reasonable than the one in *Commercial Business Systems.* Moreover, there is credible evidence that GDIT normally does not compete subcontracts in similar circumstances. In fact, the subcontracts manager stated that in her more than ten years at GDIT she had not competed this type of subcontract. Thus, Adnet had more than a mere hope that it would be awarded the subcontract—this evidence suggests the existence of a business expectancy in the subcontract, with a probability of future economic benefit to Adnet. In any event, there are disputes of material fact that would bar summary judgment on this point.

Additionally, there is evidence of a reasonable certainty that but for Defendants' intentional misconduct—reaching out to GDIT and then bidding for the subcontract while employed by Adnet—Adnet would have been awarded the subcontract. Although GDIT

stated at depositions that it decided to compete the subcontract in part due to concerns with Adnet's high prices and the request that GDIT pay for its lab, there is again a dispute of material fact as to whether GDIT would have competed the subcontract based on these facts alone. After Adnet gave GDIT its pricing, GDIT had those allegedly high prices approved by the Army, indicating that it was fine with moving forward at Adnet's price. Additionally, there is no evidence that GDIT planned to compete the subcontract prior to Defendants reaching out to GDIT. Instead, GDIT decided to compete the contract only after Defendants informed GDIT that RoLaJa could perform under the subcontract.[11]

Accordingly, we conclude that there is sufficient evidence for a reasonable juror to conclude that Adnet had a business expectancy in GDIT's subcontract and, absent Defendants' intentional misconduct, a similar reasonable certainty that Adnet would have been awarded that subcontract.

Therefore, we must reverse the district court's grant of summary judgment to Defendants on Adnet's tortious interference claim.

V.

---

[11] The fact that Adnet was ultimately not awarded the subcontract due to a deficiency in its proposal does not affect our conclusion. Had Defendants not reached out to GDIT in the first place, there is a dispute of fact as to whether GDIT would have competed the subcontract. Assuming, as we must at summary judgment, that GDIT would not have made the subcontract subject to competitive bidding, Adnet would not have been required to submit such a bid and the fact that it did not provide resumes may well not have mattered.

In light of the foregoing, we also vacate and remand the district court's dismissal of Adnet's business conspiracy claim.

Business conspiracy under Virginia law occurs when two or more people "combine, associate, agree, mutually undertake or concert together for the purpose of . . . willfully and maliciously injuring another in his reputation, trade, business, or profession by any means whatever." Va. Code. § 18.2-499(A). "[W]ithout proof of the underlying tort, there can be no conspiracy to commit the tort." *Com. Bus. Sys.*, 484 S.E.2d at 896.

The district court concluded that because Adnet failed to establish either a breach of the duty of loyalty or tortious interference, there was no unlawful action that could be the predicate object of a conspiracy. Because we conclude that there is sufficient evidence of both a breach of the duty of loyalty and tortious interference with a business relationship, we remand Adnet's claim for business conspiracy to the district court to determine in the first instance whether its remaining elements have been met.

## VI.

For these reasons, we reverse the district court's grant of summary judgment to Defendants on Adnet's claims for breach of the duty of loyalty and tortious interference with a business relationship. We vacate the district court's grant of summary judgment to Defendants on Adnet's business conspiracy claim and remand for further proceedings in accordance with this opinion.

*REVERSED IN PART, VACATED IN PART, AND REMANDED*

21

WILKINSON, Circuit Judge, concurring:

I am pleased to concur in Judge Agee's fine opinion in this case, which rests rightly on the head of the proverbial pin. The facts frustrate easy attempts to glean any large anticompetitive principle from the case. There is a significant dispute as to whether the Adnet workers learned about the subcontract opportunity while on the job. The workers pled utter ignorance, but their text messages suggested that they were fully aware of Adnet's subcontract bid days before the subcontract bids were due. J.A. 456. In other words, the workers may have used their inside information to undercut their own employer at the very time they were working for it. The particular facts here give rise to a jury question as to whether the workers breached their duty of loyalty.

Moreover, the prime contractor was an unusual solicitation target for the workers. The prime contractor had extended initial outreach to Adnet, obtained Defense Department approval for Adnet's offer, and had an extremely limited track record of making subcontractors compete. On these specific facts, the workers may have sparked an asymmetric bidding war with Adnet, where the workers knew of Adnet's involvement in the contracting process, but Adnet was unawares. The particular facts here raise a jury question as to whether the workers tortiously interfered with their employer's legitimate business expectancy.

At the same time, Virginia employers and employees should view the disposition of this fact-bound case in the broader context of Virginia law. The commercial torts at hand can have the same anticompetitive effects as formal non-compete agreements without their offsetting benefits for workers, such as bargained-for consideration and

contractual limits. I do not think our decision undermines the proposition that Virginia law confines the scope of commercial torts in recognition of the importance of employee rights and free competition.

To begin, the Virginia Supreme Court has made clear that, absent contractual restrictions, workers are entitled to "make arrangements" to compete with their employer. *Williams v. Dominion Tech. Partners, L.L.C.*, 576 S.E.2d 752, 757 (Va. 2003). The mere "fact that particular conduct of an employee caused harm to his employer" will not create liability. *Id.* at 758. To the contrary, employee loyalty is better earned in the "competitive marketplace" than ensconced in the law. *Id.* (quoting *ITT Hartford Group, Inc. v. Va. Fin. Assocs., Inc.*, 520 S.E.2d 355, 361 (Va. 1999)).

The examples of violations in *Williams* set a high bar, and not by accident. Virginia law incorporates a "policy of free competition." *Feddeman & Co. v. Langan Assoc.*, 530 S.E.2d 668, 672 (Va. 2000). Formal covenants not to compete are routinely struck down as "disfavored restraints on trade." *Omniplex World Servs. Corp. v. U.S. Investigations Servs., Inc.*, 618 S.E.2d 340, 342 (Va. 2005) (comparing cases). More recently, the Virginia legislature outlawed non-compete agreements entirely for workers with below-average salaries. *See* Va. Code Ann. § 40.1-28.7:8 (2020).

Virginia law thus recognizes that non-compete agreements and commercial-tort doctrines can have a deadening effect on competition, which often translates to higher prices and lower quality. This case is Exhibit A: But for the workers' bid, the prime contractor—and in turn the federal government to whom the contractor passed along the costs—was to pay ninety percent more in the subcontract's third year. Anticompetitive

measures can moreover drain the vitality from the economy, entrenching incumbents while making start-ups more difficult to form and hard to grow. Ronald J. Gilson, *The Legal Infrastructure of High Technology Industrial Districts: Silicon Valley, Route 128, and Covenants Not to Compete*, 74 N.Y.U. L. Rev. 575, 579 (1999).

Today's employers may wish to freeze the status quo, but Virginia law does not. To be sure, the Commonwealth does protect a legitimate range of employer interests, centered chiefly around the theft of trade secrets. *Williams*, 576 S.E.2d at 758. The law's competitive bent is thus tempered for reasons of "integrity and fairness." *Feddeman*, 530 S.E.2d at 672. One can sympathize with the company that invests years training a worker only to see the fruits promptly be put to use for a rival. While decent treatment of employees is the most reliable antidote to such worker departures, *Williams*, 576 S.E.2d at 758, the commercial torts provide a limited backstop against particularly disloyal or disruptive conduct.

But the negative side of non-competes and commercial torts, outside this sphere of employer interests, is severe. These restrictions can render employment relationships sclerotic, overriding a worker's "right to secure gainful employment." *Omniplex*, 618 S.E.2d at 342. In so doing, they risk depriving workers of what little leverage and bargaining power they might have. In addition, anticompetitive arrangements can force workers to move to a new town or state to avoid the oppressive overhang of their past job. Such effects are especially felt by those who anticipate being laid off. Given the perils of job loss, it is difficult to fault workers who must support their families and themselves by seeking employment continuity.

24

The foregoing considerations explain why a multitude of states, Virginia included, has enacted partial or wholesale prohibitions on contractual barriers to finding work. *See, e.g.*, Cal. Bus. & Prof. Code § 16600; Colo. Rev. Stat. Ann. § 8-2-113(2)(a); Okla. Stat. Ann. tit. 15, § 219A; Va. Code Ann. § 40.1-28.7:8. In the absence of further legislation, I do not understand Virginia law to be insensitive to the detrimental effects of expansive commercial torts. Though factual disputes preclude summary judgment in this narrow context, I am wary of giving license to common-law torts beyond the strict limits countenanced by Virginia law.